**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

PAT SICA,                          :
                                   :
                     Plaintiff,    :     **OPINION AND**
                                   :     **ORDER**
       - against -                 :
                                   :     **13-CV-05936 (RLE)**
CAROLYN W. COLVIN, Acting          :
Commissioner of Social Security,   :
                                   :
                     Defendant.    :
_____

**RONALD L. ELLIS, U.S.M.J.:**

## I. INTRODUCTION

Plaintiff Pat Sica ("Sica") commenced an action under the Social Security Act (the "Act"), 42

U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the

"Commissioner") that his claim for disability benefits be denied. On August 27, 2013, Sica filed a

motion for judgment on the pleadings asking the Court to remand the case to the Appeals Council for

reconsideration of the evidence or, in the alternative, reverse the decision in its entirety and find that he

was disabled after December 15, 2010.  On March 24, 2014, the Commissioner filed a cross motion for

judgment on the pleadings, asking the Court to affirm the Commissioner's decision. For the following,

I recommend that the Commissioner's motion be **GRANTED** and the case be **DISMISSED**.

## II. BACKGROUND

### A. Procedural History

Sica applied for disability insurance benefits and social security income on May 6, 2011.

(Transcript of Administrative Proceedings ("Tr.") at 108-14.)  The Social Security Administration

("SSA") denied Sica's claims on August 12, 2011, *id.* at 61, and on August 31, Sica requested a

hearing before an Administrative Law Judge ("ALJ").  (*Id.* at 69.)  Sica appeared before ALJ Brian W.

Lemoine on June 1, 2012. (*Id.* at 26-49.) Sica was represented by Attorney Michael Weiss. (*Id.*)  The

ALJ subsequently issued a decision on June 20, 2012, finding that Sica was not disabled under the Act

and was not entitled to disability insurance benefits. (*Id.* at 11-21.)  Sica requested review by the

Social Security Appeals Council on July 11, 2012. (*Id.* at 161-162.)  On August 2, 2013, the ALJ's

decision became the Commissioner's final decision when the Social Security Appeals Council denied

Sica's request for review. (*Id.* at 1-4.)  This Complaint followed.  Sica's attorney submitted a motion

for judgment on the pleadings on February 20, 2014. (Mem. of Law in Supp. of Pl.'s Mot. for J. on the

Pleadings ("Pl. Mem.")  The Commissioner submitted a cross motion for judgment on the pleadings

and in opposition to Sica's motion for judgment on the pleadings on March 24, 2014.  (Mem. of Law in

Opp. Of Pl.'s Mot. for J. on the Pleadings ("Df. Mem.")).

## B. The ALJ Hearing

### 1.  Testimony of Pat Sica at the Hearing

Sica was born on July 28, 1966. (Tr. at 108.) He is married and has three children. (*Id.* at

109.) He completed four or more years of college and has fire academy and emergency medical

technician (EMT) specialized training. (*Id.* at 129.)  Sica worked as a firefighter for the Yonkers Fire

Department from November 1994 until December 2010. (*Id.* at 130.)

While working as a firefighter, Sica worked part-time as a cashier for D&D Garden Center, a

restaurant that is now closed. (Tr. at 30.) Sica testified that he has suffered from Meniere's disease[1]

since 1995 or 1996, and that the main symptoms of this condition are spontaneous episodes of vertigo,[2]

which have gotten worse over time. (*Id.* at 31.) He testified that his episodes of vertigo prevent him

from driving far distances. (*Id.* at 33.)

---

[1] Meniere's disease is an illness that causes hearing loss, tinnitus, and vertigo. *Dorland's Illustrated Medical Dictionary,* 1642 (28th ed. 1994).

[2] Vertigo is the illusory sense that either the environment or one's own body is revolving. It is often incorrectly used to mean any form of dizziness). *Id.* at 566.

2

Sica testified that he experiences "severe ear ringing," constant "buzzing," "ticking noise," and then a "steady buzz" on his left side. (*Id.* at 35.) He testified that he can only obtain relief from the ear ringing by masking it with other sounds, and it prevents him from going to sleep and can cause him to wake up in the middle of the night. (*Id.*) He testified that, as a result of the Meniere's disease, he has lost thirty percent of his hearing abilities. (*Id.*)

Sica also testified that he has cardiomyopathies[3] that cause him to be fatigued every day and to have chest pains, and shortness of breath. (Tr at 36.) The chest pain happens daily and lasts a couple of minutes. (*Id.* at 39.)

Sica also testified that he suffers from depression and anxiety and takes medication for both. (*Id.* at 37.) These symptoms cause him to suffer from panic attacks, claustrophobia (fear of enclosed spaces), and cold sweats. (*Id.* at 37-38.) Sica testified that he has not been treated by mental health professionals for his anxiety attacks and did not participate in counseling services that are available to Yonkers Fire Department employees. (*Id.* at 38.)

Sica testified that he hurt his neck in a car accident in December 1999. (*Id.* at 47.) He received a magnetic resonance imaging ("MRI") that revealed two herniated discs in his neck. These herniated discs caused him constant pain in his neck and back, that radiated into his arms and head. (*Id.* at 39-40.) He has not received subsequent MRI's of his neck. (*Id.* at 47.) Sica believes that his vertigo may be the cause of the radiating pain in his neck. (Tr. at 40.)

Sica testified that he is able to lift a gallon of milk with no pain, but was advised by Dr. Kenneth Fox not to lift anything that requires great exertion. (*Id.*) Sica can walk a few blocks on a day when he is feeling "okay," but will get shortness of breath and light-headedness otherwise. (*Id.*) When he stands still for a long period of time, he feels fatigue in his neck and back. (*Id.* at 40-41.) If he is sitting for long periods of time and his back is bothering him, he has to keep moving to get

---

[3] Cardiomyopathy is a general diagnostic term used to describe a non-inflammatory heart disease that is often obscure with

comfortable. (*Id.* at 41.)  Sica testified that his wife and sons do most of the household tasks, but he still attends his sons' sporting events. (*Id.* at 46.)

Sica testified that he believes that his vertigo and heart condition will get "progressively worse" and prevent him from working a less demanding full-time job that does not require him to do any "strenuous lifting or exertional work." (Tr. at 45.)  He has not looked for any other employment since he stopped working as a firefighter, (*Id.* at 44.) and he is still an employee on the Yonkers Fire Department's payroll and receives his normal salary, although he is not required to report to work and is on unlimited sick leave. (*Id.* at 45.)

### 2. Medical Evidence

#### a. Westchester Medical Center

On December 12, 1999, Sica was involved in a car accident and was taken to the Westchester Medical Center's emergency room for treatment. (Tr. at 200.)  When he arrived at the Medical Center, he complained of knee, chest, neck, and back pain. Doctors examined him, took X-rays, and then prescribed pain medication. (*Id.* at 201-04.)  On December 12, 1999, Dr. Michael Swirsky and Dr. Peter Doss reviewed Sica's X-rays and found no evidence of trauma in Sica's chest, no evidence of a fracture/dislocation in his pelvis, and found that Sica's cervical spine was normal. (*Id.* at 207-08.)

On January 17, 2008, Sica received Basic Balance Function Testing from the Medical Center's Balance Center. (Tr. at 269.)  Sica was examined by the Balance Center's clinical director, Amanda Muldoon. (*Id.*)  He complained of pain in his neck and numbness on the right side of his head. (*Id.*) Sica was subject to a rotational vestibular[4] test that showed that his vestibular functions were in normal

---

an unknown cause. *Id.* at 268.

[4] Vestibular means pertaining to the vestibule: the bony cavity of the inner ear.  John Hopkins Medicine, *Glossary - Otolaryngology*, Health Library (Sep. 24, 2014), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/otolaryngology/glossary_-_otolaryngology_85,P00449/.

limits.  (*Id.*)  He also received an electronystagmography (ENG) that showed normal results, and he tested negative for positional vertigo.[5]  (*Id.*)

### b.  Michael Bardwell, D.C.

Sica was treated by Dr. Michael Bardwell at sporadic physical therapy sessions from January 2000 to April 2012.  (Tr. at 212-32, 334-54, 496-97.)  Progress notes indicate that he continued to report pain in his neck and back.  (*See id.* at 212, 214, 220, 225, 349.)  During visits, Dr. Bardwell treated Sica with electrical muscle stimulation (E.M.S.), a heat pack, an ultra-sound, and therapeutic exercise (which included stretching and massaging).  (*Id.* at 212-32, 342-496.)  The comments on the progress notes prescribe exercise to help alleviate Sica's neck and back pain.  (*See id.* at 215, 217, 223.)  At his April 5, 2000 visit, Sica reported that his firefighter duties had become more difficult because of a "notable increase" in pain spasms.  (*Id.* at 220.)  At his April 14, 2000 visit, Sica reported that he had returned to work but was not doing any heavy lifting.  (*Id.* at 221.)  From May 17, 2000, to April 25, 2012, Sica reported that he continued to work modified duties as a firefighter, had an increase in physical activities, (such as yard work, exercise, and activities with his sons), and that he was experiencing less pain with increased activities.  (*See id.* at 223, 225, 346, 496.)

### c.  Kenneth E. Fox, M.D.

On January 19, 2000, Sica saw Dr. Kenneth E. Fox and complained of back pain.  (Tr. at 233.) Dr. Fox diagnosed Sica with chest and spine derangement and a herniated disc, and prescribed pain medicine.  (*Id.* at 235-36.)  On February 2, 2000, Dr. Fox conducted nerve conduction and electromyography (EMG) tests on Sica, and concluded that his nerve and muscle activity were in normal limits.  (*Id.* at 233.)  On February 16, 2000, Sica saw Dr. Fox again and reported radiating neck pain.  (*Id.* at 237.)  Dr. Fox examined Sica and found "spasm and tenderness" throughout the muscles next to his spine.  He diagnosed Sica with thoracic spine derangement and a herniated disc.  (*Id.*)  Dr.

---

[5] Positional vertigo is vertigo that is associated with a specific position of the head in space. *Dorland's Illustrated Medical*

Fox recommended that Sica continue with physical therapy, but indicated his "concern[] about Sica's return to work as a firefighter because of the potential high demands the job calls for." (*Id.*) The Yonkers Fire Department extended Sica's disability leave until March. (*Id.*)

On March 1, 2000, Dr. Fox examined Sica again. (Tr. at 238.) Sica reported lessened discomfort in his neck and shoulders. (*Id.*) Dr. Fox diagnosed Sica with radiculopathy[6] and treated him with an injection of pain medicine. (*Id.*) On March 15, 2000, another examination by Dr. Fox resulted in the same diagnosis. (*Id.* at 239.) At this latter visit, Dr. Fox determined that Sica could resume work again on March 21, 2000. (*Id.*)

On April 19, 2000, Sica saw Dr. Fox for a physical examination and reported stiffness in his neck and shoulders. (Tr. at 240.) Dr. Fox recommended that Sica continue with his home exercise and chiropractic treatment. (*Id.*) On May 31, Sica saw Dr. Fox for another physical examination. (*Id.* at 241.) Sica reported that he felt pain with increased activity, that he continued to feel a tightness in his neck and shoulder that radiated to the right side of his body, and that his regular duties as a firefighter aggravated the pain in his neck and shoulder. (*Id.*) Dr. Fox's diagnosis remained the same, and he recommended that Sica continue his chiropractic sessions. (*Id.*)

On July 26, Sica saw Dr. Fox for another physical examination. (Tr. at 242.) Sica reported recurring soreness and stiffness in the upper right part of his back. (*Id.*) He also reported that he had returned to regular duties at his job. (*Id.*) Dr. Fox recommended three weeks of acupuncture. (*Id.*) On September 13, Sica saw Dr. Fox for a physical examination and reported that he had been doing physically demanding job-related training. (*Id.* at 243) Sica reported soreness in his neck, middle back, and right shoulder. (*Id.*) Dr. Fox treated Sica with acupuncture. (*Id.*)

---

*Dictionary,* 1820 (28th ed. 1994).

[6] "Radiculopathy" is a term used to refer to any problem affecting the nerve roots that branch off of the spinal cord. Symptoms of radiculopathy include sharp pains, numbness and weakness. John Hopkins Medicine, *Acute Radiculopathies*, Health Library (Sep. 24, 2014),

http://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/acute_radiculopathies_134,11/.

Sica saw Dr. Fox for physical examinations on September 27, and October 11, and was treated with acupuncture both times.  (Tr. at 244-45.)  On October 25, Sica saw Dr. Fox for another physical examination and reported no improvement in his symptoms.  (*Id.* at 244-46.)  Dr. Fox ceased the acupuncture treatment.  (*Id.*)  Sica was examined by Dr. Fox for the last time on February 9, 2001. (*Id.* at 247.)  Sica reported that he continued to have recurring pain, and that the pain intensified with increased activity or cold weather.  (*Id.*)

### d.   Michael J. Schnur, M.D.

Sica was referred to Dr. Michael J. Schnur to interpret the results of the MRI of his cervical spine.  (Tr. at 248.)  Dr. Schnur concluded that the MRI results were normal.  (*Id.*)  Specifically, Dr. Schnur found that Sica's bone marrow signal intensity and discs were unremarkable, the dense tissues in his shoulder appeared to be normal with a mild impression, and there was no pressure in his shoulder.  (*Id.*)

### e.   Seth L. Neubardt, M.D.

On or around March 7, 2000, Sica saw Dr. Seth L. Neubardt, a spinal surgeon.  (Tr. at 249-50.) Sica complained to Dr. Neubardt of neck and back pain that radiated to his right arm.  Dr. Neubardt examined Sica and found no joint or muscle pain, no joint swelling, and no weakness of joints or muscles.  (*Id.* at 249-50.)  Dr. Neubardt also found that Sica had a full range of neck motion and that his motor, sensory, and reflexes were intact.  (*Id.*)  Dr. Neubardt noted some tenderness in Sica's right shoulder during the examination.  (*Id.*)  He concluded that Sica's MRI results showed that he had a herniated disc in his right shoulder, and his EMG results showed radiculopathy on the right side of his body.  (*Id.*)  Dr. Neubardt diagnosed Sica with a herniated disc, cervical strain, and cervical radiculopathy, and recommended that Sica continue with chiropractic care. (*Id.*)

7

### f.   George Braff, M.D.

On December 21, 1999, Sica saw Dr. George Braff, a radiologist, for an ultrasound of his neck and both shoulders. (Tr. at 251.) Dr. Braff found no evidence of a mass, abscess, cyst, tumor, hemorrhage, or hematoma. (*Id.*) Dr. Braff found an abnormality in Sica's right shoulder and inflammation in his right shoulder, nerve root, and connecting joint in his neck. (*Id.* 251-52.) Dr. Braff noted that his findings should be corroborated by another physician. (*Id.*)

### g.   Richard Rosenberg, M.D.

Sica was examined by Dr. Richard Rosenberg on December 17, 2010, and January 20, January 19, and February 16, 2011. (*Id.* at 262-67.) At his December 17 visit, Sica reported that he had experienced vertigo for ten years and that his last episode of vertigo occurred one and a half years earlier. (*Id.* at 265.) At each of the visits, Sica reported ringing and buzzing in his ears and lightheadedness, and indicated that the symptoms responded only somewhat favorably to medication. (*Id.* at 262-67.) Dr. Rosenberg diagnosed Sica with tinnitus. (*Id.* at 262-63, 265.)

### g.   Angela Damiano, M.D.

Sica saw Dr. Angela Damiano, an ear, nose, and throat physician, on December 19, 2007. (Tr. at 268.) Sica reported to Dr. Damiano that he was feeling off-balance and experiencing nausea and vomiting. (*Id.*) Dr. Damiano found that Sica had mild hearing loss and a deviated nasal septum. (*Id.*) He diagnosed Sica with disequilibrium, and recommended "balance function testing" and head exercises to improve his symptoms. (*Id.*)

### h.   Harvey Kramer, M.D.

On February 4, 2011, Sica saw Dr. Harvey Kramer, a cardiologist. (Tr. at 288.) Dr. Kramer listed the following as Sica's "active" problems: (1) unusual chest pain; (2) dilated cardiomyopathy; (3) mitral valve prolapse;[7] (4) mitral regurgitation;[8] (5) hyperlipidemia;[9] and (6) hypertension. (*See id.* at

---

[7] The mitral valve is located between the left atrium and the left ventricle in the heart and is composed of two flaps.

8

279, 288, 295.)  At this consultation, Sica reported that he was following a low salt diet, and walking or running for thirty minutes, three to five times a week. (*Id.* at 288)  Dr. Kramer diagnosed Sica with mitral valve prolapse and mitral regurgitation. The degree of mitral regurgitation varied from moderate-severe to mild depending on the method of measurement.[10]  (*See id.* at 281, 290, 297.)

Dr. Kramer found that since Sica was not currently displaying symptoms of severe regurgitation, valve repair surgery was not required at that time.  (*Id.*)  He also found that Sica's left ventricle was dilated, functioning at a rate lower than normal, and should be further monitored.  (*Id.*)  Dr. Kramer noted that Sica had hypertension and non-hemodynamically[11] significant disease and suggested that Sica be placed on a vascular risk factor modification program.  (*Id.*)  Additionally, Dr. Kramer found that Sica suffered from atypical shortness of breath and chest pain. (*See id.* at 281, 290, 297-298.)  Dr. Kramer noted, however, that the chest pain was not caused by Sica's coronary artery disease and that it was unlikely that this pain was related to Sica's mitral prolapse.  (*Id.*) He suggested that Sica switch to a low fat and low cholesterol diet and exercise. (*See id.* at 282, 291, 298.  In a letter dated February 22, 2011, Dr. Kramer recommended that Sica not return to frontline duties as a firefighter.  (Tr. at 478-79.)

---

Normally the flaps are held tightly closed during contraction of the left ventricle. Mitral valve prolapse is the bulging of one or both of the mitral valve flaps into the left atrium during the contraction of the heart, potentially preventing one or both of the flaps from closing properly. Symptoms of Mitral Valve Prolapse include heart palpitations and chest pain. John Hopkins Medicine, *Mitral Valve Prolapse*, Health Library (Sep. 24, 2014),

http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/cardiovascular_diseases/mitral_valve_prolapse_85,P00229/.
[8] Mitral regurgitation is the backflow of blood from the left ventricle to the left atrium, which may result in an abnormal sound in the heart due to turbulent blood flow *Id.*

[9] Hyperlipidemia refers to high levels of fats in the blood, such as cholesterol and triglycerides. John Hopkins Medicine, *Medical Management of Vascular Conditions*, Health Library (Sep. 24, 2014),

http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/cardiovascular_diseases/medical_management_of_vascular_conditions_85,P08253/.
[10] Cardiac catherization is the advancement of a small catheter from a blood vessel in the groin or arm through the aorta into the heart. This procedure is performed to evaluate and diagnose a variety of heart diseases. John Hopkins Medicine, *Cardiac Catheterization*, Health Library (Sep. 24, 2014),

http://www.hopkinsmedicine.org/healthlibrary/test_procedures/cardiovascular/cardiac_catheterization_procedure_92,P0796 4/.
[11] Hemodynamic pertains to the movements involved in the circulation of blood. *Dorland's Illustrated Medical Dictionary,* 748 (28th ed. 1994).

On March 21, 2011, Sica saw Dr. Kramer again to further evaluate his cardiomyopathy, hyperlipidemia, hypertension, and mitral regurgitation conditions. (Tr. at 295.) Sica reported occasional fatigue and dizziness. (*Id.* at 296.) He told Dr. Kramer that he was following a low salt diet and walking or running for thirty minutes three to five times a week. (*See id.* at 288, 296.) Dr. Kramer's diagnoses remained the same. (*See id.* 280-82, 288-91, 297-98.)

On May 2, 2011, Sica saw Dr. Kramer for a further evaluation. (*Id.* at 279.) Sica complained of stress and fatigue and told Dr. Kramer that he was now exercising on a treadmill for twenty to thirty minutes four to five times a week with no problem. (*Id.*) Dr. Kramer conducted another physical examination which yielded the same results as the examinations on February 4 and March 21. (*See id.* at 280-82, 288-91, 297-98) Dr. Kramer's diagnoses remained the same. (*Id.*)

Also on May 2, Dr. Kramer wrote a memorandum about Sica's emergency room visit that had occurred on September 2, 2001. (Tr. at 475.) Sica had been taken to the St. Joseph's Hospital's emergency room for symptoms of lightheadedness and dizziness. (*Id.*) Dr. Kramer reviewed the notes from the emergency room and concluded that Sica had inhaled carbon monoxide while on an emergency medical services run. (*Id.*) He noted that Sica might have been exposed to carbon monoxide several times while working as a firefighter and this exposure could be the cause of Sica's cardiac conditions. (*Id.* at 475-476)

On August 1, Dr. Kramer corresponded with Dr. Contacessa about Sica's general complaints of chest pain, shortness of breath, and lightheadedness. (Tr. at 469-72.) Dr. Kramer stated that he did not believe that Sica's symptoms resulted from his cardiac condition and that they could be caused by his medication. (*Id.*) Dr. Kramer further stated that Sica's "mitral regurgitation is not severe and does not warrant surgical repair at this time." (*Id.*) In this letter, Dr. Kramer concluded that Sica's blood pressure, lipids, and coronary artery disease were well-controlled and not significant. (*Id.*)

On October 18, Sica saw Dr. Kramer again for evaluation. (Tr. at 465.) Dr. Kramer noted that Sica's high blood pressure was "borderline ok." (*Id.* at 467.) His opinion was otherwise unchanged. (*See id.* at 280-82, 288-91, 297-98, 467.)

On November 22, Sica saw Dr. Kramer for another examination. (Tr. at 465, 489.) He complained of mild dizziness and mild heart flutters. (*Id.* at 489.) Dr. Kramer's opinion remained the same. (*See id.* at 280-82, 288-91, 297-98, 467, 491.)

On January 13, 2012, Sica saw Dr. Kramer for another examination. (Tr. at 465, 489, 485.) He complained to Dr. Kramer that he had been feeling more tired but no longer had chest pain or dizziness. (*Id.* at 485.) Dr. Kramer's opinion remained the same. (*See id.* at 280-82, 288-91, 297-98, 467, 491, 487.)

### i.    Yan Li, M.D.

On December 22, 2010, Sica saw Dr. Yan Li for a physical examination. (Tr. at 306-08.) Dr. Li recommended that Sica avoid heavy physical exertion, excessive alcohol, caffeine, and any other foods that could cause heartburn. (*Id.*) Dr. Li did a cardiac test, and found that Sica had moderate to severe mitral regurgitation, increased left atrial volume, mildly dilated left ventricle with low to normal blood contraction, and moderately high blood pressure. (Tr. at 312.)

Dr. Li conducted an exercise stress test on Sica, and found that the level of exercise that Sica performed is "considered excellent for an individual of this [Sica's] age." (Tr. at 313, 400-01.) He also found that Sica had excellent exercise tolerance, and that exercise improved his ejection fraction.[12] (*Id.* at 313-14.) Dr. Li noted, however, that "coronary artery disease cannot be ruled out," because Sica's ejection fraction did not quickly contract to the proper stimuli. (*Id.* at 314.)

---

[12] The "ejection fraction" is a measurement of the percentage of blood pumped out of the ventricles of the heart per heart beat. An ejection fraction of 55%, for example, means that 55% percent of the total amount of blood in the left ventricle is being pushed out with each heartbeat. John Hopkins Medicine, *Glossary – Cardiovascular Diseases*, Health Library (Sep. 24, 2014), http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/cardiovascular_diseases/glossary_-_cardiovascular_diseases_85,P00222/

On January 18, 2011, Sica saw Dr. Li for another exercise stress test. (Tr. at 407.)  Dr. Li found "mild to moderate mitral regurgitation, minimal aortic regurgitation, low-normal verses mildly depressed left ventricular systolic function, and minimal atherosclerotic[13] disease in the thoracic aorta [chest artery]." (*Id.*)  On December 27, 2011, Sica saw Dr. Li for another exercise stress test. (Tr. at 495.)  Dr. Li's findings were the same as the previous visit. (*Id.*)

### j.   Upright Imaging of Westchester

Dr. Steven M. Peyser conducted an MRI exam of Sica's brain at Upright Imaging of Westchester on April 7, 2008.  Sica had reported a history of dizziness and vertigo. (Tr. at 261.)  Dr. Peyser found that the images showed that Sica's ventricular system was normal. (*Id.*)  He noted that the images revealed no hemorrhages, abnormalities, or other remarkable results. (*Id.*)  Another MRI was conducted on February 3, 2011, after Sica complained of dizziness and ringing on the left side of his head. (Tr. at 260.)  Dr. George J. Cavaliere interpreted the MRI and found the results to be unremarkable and normal. (*Id.*)

### k.   Saint Joseph's Medical Center

Sica was admitted to the Saint Joseph's Medical Center's emergency room on December 12, 2010 for complaints of chest wall pain. (Tr. at 373.)  Dr. San Diego conducted a physical examination and performed an EKG. (*Id.* at 375.)  He noted no abnormalities. (*Id.* at 375-77.)  Staff prescribed Sica medicine and discharged him from the emergency room early the next day. (*Id.* at 372, 379.)  At the time of discharge, Sica reported his pain level as one on a scale of one to ten. (*Id.* at 375-77.)

### l.   Katherine D. Tobin, M.D.

Sica saw Dr. Katherine D. Tobin on December 12, 2010, for a computed tomography ("CT") scan interpretation. (Tr. at 385.)  Sica reported pain in his chest. (*Id.*)  Dr. Tobin found no evidence of

---

[13] Atherosclerosis is a disease in which plaque builds up in the arteries. *Dorland's Illustrated Medical Dictionary,* 154 (28th ed. 1994).

an "acute abnormality." (*Id.*) On December 13, 2010, Dr. Tobin conducted another CT scan with the same results. (*Id.* at 384)

### m.   Jill Zeitlin, M.D.

Dr. Jill Zeitlin, an ear, nose, and throat physician, examined Sica on or around July 14, 2011. (Tr. at 419- 21.) Sica had complained of dizziness and vertigo. (*Id.* at 419.) He reported that his vertigo episode started spontaneously, had lasted for about two weeks, and caused him to feel imbalanced and light-headed. (*Id.*) Dr. Zeitlin examined Sica's ear, nasal system, throat, hearing abilities, eyes, head, face, and neck. (*Id.* at 20.) He diagnosed Sica with sensory hearing loss and tinnitus. (*Id.*)

### n.   Dr. Ilene Stone, M.D.

On July 20, 2011, Sica saw Dr. Ilene Stone, a physician at North Disability Services, for an internal medicine examination. (Tr. at 428-33.) Sica had complained of coronary issues beginning December 2010 (*Id.* at 311, 428.) including a dull and aching chest pain that reached a pain level of five to seven on a scale of one to ten. (*Id.* at 428.) Sica also complained of fatigue, and shortness of breath when he walked or exercised, or sometimes while he was at rest. (*Id.*) He reported hearing loss, tinnitus, lightheadedness, and increasingly frequent episodes of vertigo. (*Id.*) He also reported constant neck pain radiating down to his right arm and lower back pain radiating to his lower leg since 2001. (*Id.* at 428-29.)

Dr. Stone diagnosed Sica with cardiac disease, cardiomyopathy, mitral valve prolapse, and possibly coronary artery disease. (*Id.* at 432.) Dr. Stone also diagnosed Sica with Meniere's disease, neck pain, low back pain, high blood pressure, and depression and anxiety. (*Id.*) Dr. Stone's prognosis for Sica's cardiac conditions, Meniere's disease, and low back pain was fair to guarded. (*Id.*) Her prognosis for Sica's neck pain was fair, and her prognosis for his high blood pressure was stable. (*Id.*) Dr. Stone concluded that Sica's conditions caused him "minimal to mild restrictions for standing,

13

walking, sitting, bending, lifting, and pulling." (*Id.*)  Dr. Stone recommended that Sica avoid uneven ground to avoid feeling dizziness and avoid heavy exertion because of his cardiac history. (*Id.*)

### o.   A. Auerbach, Medical Consultant

On July 25, 2011, Sica saw A. Auerbach, a medical consultant and internist for the Division of Disability Determinations in the New York State Office of Temporary and Disability Assistance. (Tr. at 435-36.) Sica complained of tinnitus. (*Id.*) Auerbach concluded that Sica's auditory condition does not "meet or equal any listings and no further evaluation appears indicated." (*Id.*)

Auerbach noted that Sica's treating cardiologist had concluded that Sica's chest pain was abnormal and caused by a non-hemodynamically significant disease. (Tr. at 435.)  Auerbach also noted that Sica's cardiologist had found that Sica's complaints of shortness of breath were not related to his mild cardiomyopathy condition. (*Id.*) Auerbach noted that Sica's cardiac exam results have not showed signs of any possible failures. (*Id.*) Auerbach concluded that, based on the available cardiac medical evidence, Sica can lift up to fifty pounds and stand, walk, or sit for six to eight hours. (*Id.*)

On July 29, 2011, Sica saw Auerbach again. (Tr. at 437-438.)  Sica complained of back pain and neck pain that radiated to his right arm and caused tingling in his fingers. (*Id.* at 438.)  Auerbach found that Sica could perform a full squat and had a normal range of motion in his cervical spine. (*Id.*) Auerbach found that the range of motion for Sica's lumbar spine was mildly limited, and that his lumber joint and right shoulder were tender. (*Id.*) Auerbach also noted that Sica had decreased pain sensation in his right hand but that his motor skills were intact. (*Id.*) Auerbach concluded that Sica was capable of lifting twenty pounds and could stand, walk, or sit for six to eight hours but should avoid "balancing, heights, and hazards." (*Id.*)

### p.   Montefiore-Einstein Heart Center, Cardiac Catheterization Lab

Sica visited the Cardiac Catheterization Lab at the Montefiore-Einstein Heart Center on January 5, 2011, to receive catheterization of his left and right ventricle, a coronary exam, and a medical

14

imaging test of his cardiac system. (Tr. at 309-11.)  Sica reported chest pain and a shortness of breath. (*Id.* at 428.)  Doctors at the Heart Center concluded that Sica had a mildly depressed ventricular ejection fraction, mild mitral regurgitation, moderate diagonal disease, and that the rest of his coronary arteries were unremarkable.  (*Id.*)

### q.  Psychiatric Assessments

Dr. John Laurence Miller, Ph.D conducted a psychiatric evaluation of Sica on or around July 20, 2011.  (Tr. at 424-27.)  Sica complained of waking up in the middle of the night two to three times a week since the start of his medical problems, and panic attacks about five times a week.  (*Id.* at 424-25.)  Dr. Miller concluded that Sica's demeanor was cooperative and that he possessed adequate social skills.  (*Id.* at 425.)  He found that Sica's "thought process was coherent and goal-directed with no evidence of hallucinations, delusions or paranoia in evaluation setting."  (*Id.*)  Dr. Miller also found that Sica had good judgment and that his attention, concentration, recent, and remote skills were intact. (*Id.* at 425-26.)

Dr. Miller noted that Sica "appeared to have trouble dealing appropriately with stress."  (Tr. at 426.)  He noted that Sica "may have trouble maintaining a regular [work] schedule" because of his panic attacks, difficulty sleeping, and physical pain. (*Id.*)  Dr. Miller concluded that Sica's "psychiatric problems were not significant enough to interfere with [his] ability to function on a daily basis."  (*Id.* at 426.)  He diagnosed Sica with panic disorder without agoraphobia,[14] and adjustment disorder with depressed mood.  (*Id.*)  Dr. Miller recommended that Sica receive a psychiatric intervention, because he was "at risk of not being able to return to work as a firefighter."  (*Id.* at 427.)  Dr. Miller's prognosis concluded that Sica would be able to return to some meaningful work as quickly as possible.  (*Id.*)

---

[14] Agoraphobia is the fear and anxiety of being in places where it is hard to escape, or where help might not be available. Agoraphobia usually involves fear of crowds, bridges, or of being outside alone. U.S. National Library of Medicine, *Agoraphobia*, PubMed Health (September 26, 2014), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001921/

On August 11, 2011, Sica saw Dr. Hoffman for a psychiatric review. Dr. Hoffman concluded

that Sica's impairment was not severe. (Tr. at 439-52.) He diagnosed Sica with an adjustment disorder

with depressed mood, but noted that Sica's disorder did not fully satisfy the medical diagnostic criteria

for affective mood disorders. (*Id.* at 442.) Dr. Hoffman also diagnosed Sica with a panic disorder

without agoraphobia. (*Id.* at 444.) Dr. Hoffman concluded that Sica's psychiatric symptoms did not

severely limit his daily activities, his social functioning, and his ability to maintain concentration,

persistence, or pace. (*Id.* at 449, 451.)

### 3.  The ALJ's Findings

On June 20, 2012, ALJ Brian W. Lemoine issued his decision that Sica was not disabled within

the meaning of sections 216(i) and 223(d) of the Social Security Act, (Tr. 11-21), and had not been

disabled since May 6, 2011, the date that his application was filed. (*Id.*) At step two of the analysis,

the ALJ found that Sica's medical evidence revealed the following severe impairments: dilated

cardiomyopathy with mild-to-moderate mitral regurgitation and minimal aortic regurgitation; and

tenderness of cervical and lumbosacral spine. (*Id.* at 17.) The ALJ concluded that the medical

evidence produced showed that Sica's vertigo, tinnitus, and hearing loss impairments were "non-severe

in nature." (*Id.*) The ALJ noted that Dr. Damiano's medical records showed no signs of positional

vertigo, and that although Dr. Rosenberg's records showed that Sica had experienced episodes of

vertigo for over ten years, he also found Sica able to work as a firefighter and drive a car by himself.

(*Id.* at 17, 19.)

The ALJ found that Sica had "no indication of communication deficits" despite his claim of

hearing loss. (*Id.* at 17.) He observed Sica during the hearing and noted that Sica lacked the "general

appearance" of a person who might have been experiencing prolonged pain, and that Sica did not seem

to be in any "obvious pain or discomfort walking into or out of the hearing room or while sitting during

the course of the hearing." (*Id.* at 19.) The ALJ determined that Sica did not have any severe mental

16

impairments as listed in C.F.R. §12.04 and §12.06.  (*Id.* at 17.)  He relied on Dr. Miller's diagnosis of panic disorder and adjustment disorder but concluded that Sica's "symptoms were not significant enough to interfere with daily functioning."  (*Id.*) He acknowledged that Sica's MRI documentation detected herniated discs in his neck that indicated radiculopathy, but noted that these results were detected in 1999-2000 and did not affect Sica's ability to "successfully perform the heavy work as a fire-fighter" for over a decade.  (*Id.* at 17.)

At step three of the analysis, the ALJ found that Sica did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526.  (Tr. at 18.)  The ALJ found "no indication of any motor deficits or significant sensory or reflex abnormalities within the context of medical listing [section] 1.04A."  (*Id.*)  He also noted that Sica's cardiac symptoms did not rise to the level of the medical listings contained in section 4.00.  (*Id.*)

In steps four and five of the analysis, the ALJ found that Sica had the residual functional capacity ("RFC") to perform his past relevant work as a cashier as it is generally performed at the "light exertional level within the national economy." He directed a finding of "not disabled" at step four of the analysis.  (*Id.* at 20.)

The ALJ found that Sica's medical records showed that he was unable to carry more than "20 pounds occasionally or 10 pounds frequently" but was still capable of performing light exertional work. (Tr. at 19.)  He noted that Dr. Kramer's records documented that Sica's cardiac condition was stable with medication, and that the medications had no adverse effects.  (*Id.*)

The ALJ noted that Sica's cardiac condition had not led to any emergency hospitalizations or surgical interventions, or required him to use any assistive device.  (Tr. at 19.)  He gave Dr. Li's assessment of the evidence "substantial credence," because her findings were consistent with Dr. Kramer's findings that Sica's cardiac disease did not limit his physical activity.  (*Id.*)  The ALJ further

17

relied on Sica's testimony that he assisted with childcare and worked out on a treadmill five days a week for thirty minutes at a time with no difficulty to conclude that he was fully independent in all aspects of self-care and daily living activities.  (*Id.*)  Lastly, the ALJ noted that Sica had no financial incentive to return back to work, because he was receiving his full salary from the Yonkers Fire Department while his disability retirement application was pending.  (*Id.*)

The ALJ concluded that Sica could perform his past relevant work as a cashier as it is performed in the national economy because it is light work[15] as defined in 20 C.F.R. § 404.1567(b). (Tr. at 20.)  The ALJ noted that Sica testified that he had worked part-time as a cashier, and that according to his earnings report, he had performed this position at substantial gainful activity levels. (*Id.*)  The ALJ determined that a cashier position is classified in the Dictionary of Occupational Titles ("DOT") as generally performed at the light extertional level within the national economy.  (*See id.*, DOT code #211.462-014.)    Therefore, the ALJ concluded that Sica retains the RFC to "perform past relevant work as it is performed within the national economy." (*Id.*)

The ALJ found that even if the evidence did not support the above conclusion, a finding of "no disability" would still be warranted at step five of the analysis. (*Id.* at 18, 20.)  The ALJ noted that Sica is a "younger individual, aged 18-49," and has a college education.  He concluded that there is no issue of "skill transferability," and a finding of "not disabled" is warranted by application of Medical Vocational Rule § 202.21.  (*See id.* at 20; 20 C.F.R. Part 404, Appendix 2 to Subpart P.)

## C. Appeals Council Review

Sica requested review of the ALJ's decision by the Appeals Council on July 11, 2012.  (Tr. at 161-62.)  He submitted additional evidence from the period of June 21, 2012, through November 14, 2012.  (*Id.* at 2.)  The Appeals Council determined that since the ALJ decided Sica's case based on

---

[15] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Although the weight lifted may be very little, a job falls in this category when it requires a good deal of walking, standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20

evidence dated through June 20, 2012, any new evidence dated after June 20, 2012, could not be considered in Sica's appeal. (*Id.*) The Appeals Council denied Sica's request for review on August 2, 2013. (*Id.* at 1.)

### III. DISCUSSION

#### A. Standard of Review

Judicial review is limited to determining whether the Commissioner applied the correct legal principles in making a decision and, if so, whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Arnone v. Bowen,* 882 F.2d 34, 37 (2d Cir. 1989); *Johnson v. Bowen,* 817 F.2d 983, 985; *Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir. 1984); *Richarsdon v. Perales,* U.S. 389, 401 (1971). Therefore, the reviewing court does not review *de novo* whether a claimant is disabled. *Pratts v. Charter,* 94 F.3d 34, 27 (2d Cir 1996); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991).

An ALJ's failure to apply the correct legal standard constitutes reversible error when the failure may have "affected the disposition of the case." *Pollard v. Halter,* 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir. 1984). In such a case, the Court may remand the matter to the Commissioner under 42 U.S.C. § 405(g), if it is deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue,* 563 F. Supp. 2d 418,428 (N.D.N.Y. 2008) (citing *Atartone v. Aplel,* 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)). If the reviewing court finds that the ALJ applied the correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Social Security Administration Commissioner,* 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)).

---

C.F.R. § 404.1567(b)

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." *Richardson,* 402 U.S. At 401 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). The substantial evidence standard applies to findings of fact as well as inferences and conclusions drawn from such facts. *Marrero v. Apfel,* 87 F. Supp 2d 340, 345 (S.D.N.Y. 2000); *Smith v. Shalala,* 856 F. Supp. 118, 121 (E.D.N.Y. 1994).

If the Commissioner's decision that a claimant is nor disabled is supported by substantial evidence in the record, the Court must uphold the decision. 42 U.S.C. § 405(g); *Jones,* 949 F.2d at 59; *Arnone,* at 882 F.2d 34. The Court must uphold a denial of benefits supported by substantial evidence even where substantial evidence may also support the plaintiff's position, *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir. 1990), or where a reviewing court's independent conclusion based on the evidence may differ from the Commissioner's. *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir. 1982), *cert denied,* 459 U.S. § 1212 (193); *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir. 1982). While the ALJ must set forth the essential considerations with sufficient specificity to enable the reviewing court to determine whether the decision is supported by substantial evidence, he need not "explicitly reconcile every conflicting shred of medical testimony." *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir. 1981)). A reviewing court gives deference to the ALJ's evaluation since he observed the claimant's demeanor and heard the testimony first-hand. *Pena v. Chater,* 968 F. Supp. 930, 938 (S.D.N.Y. 1997), *aff'd sub nom. Pena v. Apfel,* 141 F.3d 1152 (2d Cir. 1998) (citing *Mejias v. Social Security Administration,* 445 F. Supp. 741, 744 (S.D.N.Y. 1978)).

## B. Determination of Disability

### 1.     Evaluation of Disability Claims

Under the Social Security Act, each person who is considered to be "disabled" is entitled to disability insurance benefits.  42 U.S.C. § 423(a)(1).  The Act's definition of disability for the purposes of disability insurance is substantially similar to SSI. *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir. 1980). A person is considered disabled when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A); *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir. 1997). Establishing the mere presence of an impairment is not sufficient for a finding of disability; the impairment must cause severe functional limitations that prevent a claimant from engaging in any substantial gainful activity. 42 U.S.C. § 432(d)(2); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999). If a claimant is able to engage in his previous work or other substantial gainful work, regardless of whether such work exists in the immediate area where he lives, whether a vacancy exists, or whether he would be hired for such work, he will not be found disabled under the Act. *See* 42 U.S.C. §§ 423(d)(2)(A), and 1382c(a)(3)(B). For the individual to be found disabled, both the medical condition and the inability to engage in gainful activity must last for at least twelve months. *See Barnhart v. Walton,* 535 U.S. 212, 217-22 (2002).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step sequential analysis: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations; if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the residual functional capacity ("RFC") to perform his past work despite the disability; and

21

(5) if not, determine whether the claimant is capable of performing other work.  20 C.F.R. § 404.1520;

*Rosa,* 168 F.3d at 77; *Gonzalez v. Apfel,* 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).

The Commissioner must assess the claimant's RFC to apply the fourth and fifth steps of the inquiry. A claimant's RFC represents the most that claimant can do despite his limitations. 20 C.F.R. § 416.945(a). The Commissioner must consider objective medical facts, diagnoses and medical opinions based on such facts, subjective evidence of claimant's symptoms, as well as claimant's age, education, and work history. *Echevarria v. Apfel,* 46 F. Supp. 2D 282, 291 (S.D.N.Y. 1999); *Mongeur,* 722 F.2d at 1037 (citing *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir. 1981)); 20 C.F.R. § 404.1526(b).  To properly evaluate a claimant's RFC, the ALJ must assess the claimant's exertional capabilities, addressing his ability to sit stand, walk, lift, carry, push, and pull. 20 C.F.R. §§ 404.1545(b), 404.1569(a).  The ALJ is also required to evaluate the claimant's nonexertional limitations, including depression, nervousness, and anxiety. 20 C.F.R. §§ 404.1545(b), 404.1569(a).

The claimant bears the burden as to the first four steps of the five-step analysis, while the Commissioner has the burden of proving the fifth step.  *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982).  A claimant's own testimony regarding his daily activities often supports a finding that the claimant is capable of performing gainful activity. *See Pena,* 968 F. Supp. at 938.  If the claimant can establish that his severe impairment prevents him from returning to his previous work, the burden shifts to the Commissioner to demonstrate that the claimant retains the RFC to perform alternative substantial gainful activity which exists in the national economy. *Gonzalez,* 61 F. Supp. 2d at 29.

In addition, the Commissioner considers the claimant's statements regarding pain and other symptoms, but this alone will not establish disability.  20 C.F.R. § 404.1529(a). Medical findings must support the conclusion that the claimant suffers from an impairment which could "reasonably be expected to produce the pain or other symptoms alleged by the claimant, and which, when considered with all other evidence, would lead to the conclusion that the individual is under a disability." *See* 20

22

C.F.R. §§ 404.1529, 416.929. If the claimant's symptoms suggest a greater impairment than can be shown by objective evidence alone, other factors should be considered. *Echevarria,* 46 F. Supp. 2d at 292. These factors can include: (1) the person's daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and adverse side effects of medication taken by the individual to alleviate pain or symptoms; (5) treatment, other than medication used to relieve pain; and (6) any other measures that the person uses or has used to relieve the pain or symptoms. 20 C.F.R. §§ 404. 1529(c)(3), 416.929(c)(3). The ALJ may reject claims of severe and disabling pain after weighing medical evidence in the record, the claimant's demeanor, and other indicia of credibility. *See* Soc. Sec. Rul. 96-7p, 61 Fed. Reg. 34, 483 (1996), 1996 WL 374186 (S.S.A); *Aponte v. Secretary, Department of Health and Human Services,* 728 F.2d 588, 591-92 (2d Cir. 1984). However, the ALJ must give reasons "with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence." *Echevarria,* 46 F. Supp. 2d at 292; *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir. 1984); *see Lugo v. Apfel,* 20 F. Supp. 2d 662, 663-64 (S.D.N.Y. 1998).

### 2. The Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to

23

fill any clear gaps in the administrative record, *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a pro se claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the pro se claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of*

*Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

### 3.   The ALJ Properly Reviewed and Evaluated the Evidence, and Applied the Correct Legal Principles.

#### a.   The ALJ Correctly Applied the Five-Step Sequential Analysis

The first task of the Court is to determine whether the Commissioner applied the correct legal principles in making its determination. *Rosa,* 168 F.3d at 77. Sica asserts that the ALJ erred in finding that he did not have an "impairment or combination of impairments that meets or medically equals the severity listed in 20 CFR Part 404" and in finding "that [he]was capable of performing past relevant work as a cashier." (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") at 2, 3.)

To reach his conclusion, the ALJ conducted the tests required by 20 §§ C.F.R. 404.1527 and 416.920. First, the ALJ found that Sica had not been engaged in substantial gainful activity since May 6, 2011, the date of his application. (*Id.* at 17.) At the second step of the analysis, the ALJ found that Sica had two severe impairments: dilated cardiomyopathy and tenderness of the cervical and lumbosacral spine. At step three of the analysis, the ALJ found that, because Sica's severe impairments were not among of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1, there was no presumption of disability. (*Id.* at 17-18.) At step four of the analysis, the ALJ found that Sica still had the RFC to perform the full range of light exertional work as a cashier as it is performed at the national level, thus directing a finding of "not disabled." (*Id.*) Alternatively, the ALJ found that because Sica was a younger individual with a college education and because he worked as a cashier long enough to be able to transfer those skills to other work, he was not disabled at step five of the analysis. The ALJ concluded that Sica was not disabled under the Act. (*Id.* at 21.)

### b. The ALJ's Determination is Supported by Substantial Evidence

The ALJ reached his decision by observing Sica at the hearing and examining the evidence, including medical records and expert testimony. (Tr. 11-26.)  The ALJ found that Sica's dilated cardiomyopathy with mild-to-moderate mitral regurgitation, minimal aortic regurgitation, and tenderness of the cervical and lumbosacral spine were severe impairments listed under 20 C.F.R § 404.1520(c).  (*Id.* at 17.)  However, at step three of the analysis, the ALJ found that the objective medical evidence illustrated that Sica does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1- Listing of Impairments.  (*Id.* at 18.)  Sica disagrees, and argues that Dr. Stone's diagnosis of his Meniere's disease in conjunction with his other conditions met or medically equaled the severity listed in 20 C.F.R. Part 404 Subpart P, Appendix 1- Listing of Impairments.  (Pl. Mem. at 3.)

The ALJ reviewed all of the medical opinions and observations of Sica's treating physicians. (Tr. at 11.)  The ALJ gave substantial credence to Dr. Li, Dr. Kramer, and Dr. Miller.  (*Id.* at 18-20.) Dr. Kramer, Sica's cardiologist, diagnosed Sica with mitral valve prolapse and moderate to severe regurgitation. (*Id.* at 281, 290, 297.) Dr. Kramer noted that Sica's moderate to severe regurgitation had been reduced to mild regurgitation.  (*Id.*)  Dr. Kramer also noted that valve repair surgery was not necessary because Sica did not currently display symptoms of severe regurgitation.  (*See id.* at 281, 290, 297, 469.)  Dr. Kramer found that Sica's cardiac condition was stable with medication, exercise, and diet.  (*Id.* at 281, 290, 297-298.) Dr. Kramer's findings are also consistent with Dr. Li's diagnosis that Sica's cardiac conditions were moderate to mild and did not limit his physical activity.  (*Id.* at 306-08, 312-13, 400-01, 407, 495.)

With respect to Sica's vertigo, Dr. Kramer concluded that Sica's symptoms of lightheaded and dizziness were not related to his cardiac condition.  (*Id.* at 281, 290, 297-298, 475.)  This finding is consistent with records from Westchester Medical Center that indicated that Sica tested negative for

positional vertigo, (*id.* at 269), and MRI results from the Upwright Imaging Center that did not substantiate Sica's claims of dizziness and vertigo. (*Id.* at 261.)

With respect to Sica's neck and back pain, Dr. Neubardt's records show that Sica had no joint or muscle pain, no joint swelling and no weakness in his joints or muscles. (*Id.*) This finding is consistent with Dr. Schnur's records, which indicated that the results of an MRI of Sica's cervical spine were normal. (*Id.* at 248.)

The ALJ also considered Sica's allegations of pain and found that they were not entirely credible. (Tr. 19-20.) Deference is given to the ALJ's evaluation since he observed the claimant's demeanor and heard the testimony first hand. *Pena,* 968 F. Supp. at 930. The ALJ observed Sica at the hearing and found that Sica maintained "excellent speech discrimination with no indication of communication deficits," despite Sica's claim of hearing loss. (*Id.* at 22.) The ALJ also observed that that Sica lacked the "general appearance" of a person who might have been experiencing the prolonged pain. (*Id.* at 24.) He noted that Sica did not seem to be in any "obvious pain or discomfort walking into or out of the hearing room or while sitting during the course of the hearing." (*Id.*) In summary, there is substantial evidence that supports the ALJ's finding that Sica's impairments do not meet or medically equal the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1- Listing of Impairments, under step three of the analysis.

There is also substantial evidence that supports the ALJ's finding that Sica retained the RFC to perform work as a cashier as it is performed at the national level and as it is classified as "light work" as defined in 20 CFR § 404.1567(b). Dr. Fox's records indicated that, even with Sica's impairments, he could resume work as a firefighter on March 21, 2000. (*Id.* at 240.) Dr. Fox and Dr. Kramer both found that Sica was capable of regular exercise. (*Id.* at 240, 282, 291, 298.) According to Dr. Kramer's records, Sica walked or ran for thirty minutes three to five times per week on a regular basis. (*Id.* at 288, 296.) Dr. Li found that Sica's level of exercise was excellent for his age and that he had

excellent exercise tolerance. (*Id.* at 313, 314.) Dr. Stone's records indicated that Sica's conditions caused him to have only "minimal to mild restrictions for standing, walking, sitting, bending, lifting, and pulling." (*Id.* at 432.) There is substantial evidence to support the ALJ's conclusion that although Sica may have moderate limits, his conditions do not significantly limit him, as is required for a finding of disability. *Rosado,* 713 F. Supp. 2d at 358.

Dr. Miller noted that Sica's mental conditions "in [themselves] [do] not appear to be significant enough to interfere with [his] ability to function on a daily basis." (*Id.* at 426.) He found that Sica's "thought process was coherent and goal-directed with no evidence of hallucinations, delusions or paranoia in evaluation setting." (*Id.*) Dr. Miller also found that Sica had good judgment and that his attention, concentration, recent, and remote skills were intact. (*Id.* at 425-26.) Dr. Miller's prognosis was that Sica would be able to return to meaningful work quickly. (*Id.* at 427) Therefore, there is substantial evidence that supports the ALJ's finding that Sica is capable of performing the light work of a cashier as it is performed in the national economy.

Sica argued that Dr. Stone's diagnosis of his Meniere's disease in conjunction with his other conditions meets or medically equals the severity listed in 20 C.F.R. Part 404 Subpart P, Appendix 1- Listing of Impairments. (Pl. Mem. at 3) Sica takes issue with the fact that the ALJ did not specifically discuss Meniere's disease when determining that Sica's conditions were not sufficiently severe. He contends that the ALJ thus "omit[ted] the most significant finding;" a finding which, alone, would have provided a basis for determining that the plaintiff could not perform any substantial gainful activity. *Id.* However, the ALJ made specific reference to the symptoms of Meniere's disease – "vertigo, tinnitus, and/or hearing loss" – and determined that objective medical evidence did not establish any severe impairments referable to these conditions. (Tr. 17) The ALJ stated that though there was documentation of some hearing loss, Sica "maintain[ed] excellent speech discrimination with no indication of communication deficits." Dr. Damiano conducted vestibular/ocular motor testing of Sica

and failed to adduce signs of positional vertigo. Dr. Rosenberg noted that Sica had been experiencing episodes of vertigo for the prior ten years, yet he was still able to continue working as a firefighter and he still drives. *Id.* Therefore, there is substantial evidence that supports the ALJ's finding that Sica does not have an impairment or combination of impairments that meets or medically equals the severity listed in 20 C.F.R. Part 404, Appendix 1- Listing of Impairments.

Sica further contends that he is not capable of performing his past work as a cashier because his past job required him to carry heavy items from the grocery store to customers' cars. (*Id.* at 1-2.) However, when Sica was asked about his duties as a cashier at the hearing, he did not mention that it involved any heavy lifting. (*Id.* at 30.) The ALJ was entitled to find the hearing testimony more credible. However, even if Sica's past work as a cashier did include heavy lifting, there is still substantial evidence to support the ALJ's determination, because the determination was that Sica could work as a cashier as it is generally performed within the national economy. Cashier work as it is generally performed in the national economy is classified as light work under DOT code #211.462-014, and does not involve heavy lifting.[16] (*See id.* at 20; 20 C.F.R. § 404.1567(b).)

Accordingly, the ALJ's decision that Sica is not eligible for SSI benefits was determined under the correct legal standard and supported by substantial evidence.

---

[16] DOT code 211.462-014 outlines a cashier/checker's duties as the following: operates cash register to itemize and total customer's purchases in grocery, department, or other retail store: Reviews price sheets to note price changes and sale items. Records prices and departments, subtotals taxable items, and totals purchases on cash register. Collects cash, check, or charge payment from customer and makes change for cash transactions. Stocks shelves and marks prices on items. Counts money in cash drawer at beginning and end of work shift. May record daily transaction amounts from cash register to balance cash drawer. May weigh items, bag merchandise, issue trading stamps, and redeem food stamps and promotional coupons. May cash checks. May use electronic scanner to record price. May be designated according to items checked as Grocery Checker (retail trade). DICOT 211.462-014

## IV. CONCLUSION

For the reasons, set forth above, I recommend that Defendant's motion be **GRANTED**, and that the Complaint be **DISMISSED.**

**SO ORDERED this 30th day of September 2014**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

30